Marcia Robinson Lowry (*admitted pro hac vice*)
mlowry@abetterchildhood.org
Jonathan G. Borle (SBN # 314669)
jborle@abetterchildhood.org
A BETTER CHILDHOOD
355 Lexington Avenue, Floor 16
New York, NY 10017
Telephone: (646) 795-4456
Facsimile: (212) 692-0415

Polly Towill (SBN # 120420)
ptowill@sheppardmullin.com
Daniel Brown (*admitted pro hac vice*)
dlbrown@sheppardmullin.com
Benjamin O. Aigboboh (SBN # 268531)
baigboboh@sheppardmullin.com
Tori Kutzner (SBN # 334057)
tkutzner@sheppardmullin.com
Victoria Ayeni (SBN # 335233)
vayeni@sheppardmullin.com
Alexandria Amerine (*admitted pro hac vice*)
aamerine@sheppardmullin.com
SHEPPARD MULLIN RICHTER & HAMPTON
333 S. Hope St., Forty-Third Floor
Los Angeles, CA 90071
Telephone: (213) 620-1780
Facsimile: (213) 620-1398
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

-1-

FIRST AMENDED COMPLAINT



Gary G., by his next friend Mary Downey; Xander B., Francesca B., and Delilah B, by their next friend Colleen Strona; Teddy H., by his next friend Lori Newels; Kevin E. and Sam E., by their next friend Kelly Reynolds; Henry P., by his next friend Michaela Bain; and David O., Arnold O., and Greg R., by their next friend Jack Anthony, individually and on behalf of all other similarly situated

                           Plaintiffs,

   v.

Gavin Newsom (Governor of California), in his official capacity as Governor of the State of California; California Department of Social Services ("CDSS"); Kim Johnson (CDSS Director); San Bernardino County; Members of the San Bernardino Board of Supervisors; San Bernardino County Child & Family Services ("CFS"); Jeany Zepeda (CFS Director),

                         Defendants.

Case No. 5:23-cv-947

FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

PRELIMINARY STATEMENT ...................................................................6

4

JURISDICTION AND VENUE ...................................................................9

5

PARTIES ...................................................................................................10

6

I.   Named Plaintiffs ..............................................................................10

7

A.   Gary G. .................................................................................10

8

B.   Xander B., Francesca B., and Delilah B. ..............................10

9

C.   Teddy H. ...............................................................................11

D.   Kevin E. and Sam E. ............................................................11

10

E.   Henry P. ................................................................................11

11

F.   David O., Greg R., and Arnold O. .......................................12

12

II.  Defendants .......................................................................................12

13

A.   State Defendants ...................................................................12

14

B.   County Defendants ...............................................................13

15

APPLICABLE LAW ..................................................................................13

16

I.   FEDERAL AND STATE STATUTES IMPOSE AFFIRMATIVE
DUTIES ON DEFENDANTS ...........................................................13

17

18

II.  THE UNITED STATES AND CALIFORNIA CONSTITUTIONS
IMPOSE ADDITIONAL AFFIRMATIVE DUTIES ON
DEFENDANTS ...............................................................................17

19

20

FACTS........................................................................................................19

21

I.   CFS ENGAGES IN NUMEROUS POLICIES AND/OR PRACTICES
THAT VIOLATE THE RIGHTS OF FOSTER CHILDREN IN SAN
BERNARDINO COUNTY AND EXPOSE THEM TO A SEVERE
RISK OF FUTURE HARM ...............................................................19

22

23

A.   CFS Has Spent the Last Decade Embroiled in Controversy .............19

24

B.   CFS Fails to Adequately Vet Foster Homes or Monitor Foster
Children Once Placed ............................................................20

25

26

C.   CFS Does Not Provide Adequate Case Planning ................21

27

D.   CFS Lacks Short-Term Emergency Placements....................23

28

-3-

FIRST AMENDED COMPLAINT

    E.    CFS Does Not Provide Necessary Health Assessments or Health Services to Children ...................................................24

    F.    CFS Fails to Protect Foster Children From Maltreatment in Care ...........................................................................................26

    G.    CFS Fails to Place Foster Children Into Permanent Placements ........26

    H.    CFS Permits Its Caseworkers to Carry Dangerously High Caseloads ................................................................................28

    I.    CFS Fails to Provide Effective Services to Children with Disabilities ..............................................................................30

II.    THE REMAINING DEFENDANTS HAVE VIOLATED THE RIGHTS OF FOSTER CHILDREN IN SAN BERNARDINO COUNTY AND EXPOSED THEM TO A SEVERE RISK OF FUTURE HARM BY FAILING TO EXERCISE ADEQUATE OVERSIGHT OVER CFS .................................................................31

    A.    The County Defendants Have Failed to Exercise Adequate Oversight ...............................................................................31

    B.    The State Defendants Have Failed to Exercise Adequate Oversight ...............................................................................32

III.    THE NAMED PLAINTIFFS ARE AT SEVERE RISK OF FUTURE HARM AS A RESULT OF CFS'S ILLEGAL PRACTICES AND PROCEDURES AND THE STATE AND COUNTY DEFENDANTS' FAILURE TO EXERCISE ADEQUATE OVERSIGHT .............................................................................33

    A.    Gary G. ............................................................................34

    B.    Xander B., Francesca B., and Delilah B. .............................36

    C.    Teddy H. ...........................................................................40

    D.    Kevin E. and Sam E. .........................................................42

    E.    Henry P. ...........................................................................43

    F.    David O., Greg R., and Arnold O. .....................................46

CLASS ACTION ALLEGATIONS ........................................................49

CAUSES OF ACTION ..........................................................................53

FIRST AMENDED COMPLAINT

FIRST CAUSE OF ACTION 42 U.S.C. § 1983–The Adoption
        Assistance and Child Welfare Act (On Behalf of the General
        Class Against State Defendants and County Defendants).................53

SECOND CAUSE OF ACTION Cal. Welf. & Inst. Code § 16501.1,
        16503(a), *et seq*.–State Statutory Rights (On Behalf of the
        General Class Against County Defendants) .......................................54

THIRD CAUSE OF ACTION 42 U.S.C. § 1983–Federal Right to
        Substantive Due Process (On Behalf of the General Class
        Against State Defendants and County Defendants)...........................56

FOURTH CAUSE OF ACTION Art. I, §7(a) Cal. Const.–State Right
        to Substantive Due Process (On Behalf of the General Class
        Against County Defendants)...............................................................57

FIFTH CAUSE OF ACTION 42 U.S.C. § 1983–Federal Right to
        Family Association (On Behalf of the General Class Against
        State Defendants and County Defendants) .........................................58

SIXTH CAUSE OF ACTION 42 U.S.C. § 12131 *et seq.* –The
        Americans with Disabilities Act  (On Behalf of the ADA
        Subclass Against State Defendants and County Defendants).............59

SEVENTH CAUSE OF ACTION 29 U.S.C. § 701 *et seq*.–The
        Rehabilitation Act (On Behalf of the ADA Subclass Against
        State Defendants and County Defendants) .........................................61

EIGHTH CAUSE OF ACTION Cal. Gov't Code § 11135 *et seq.*, Cal.
        Code Regs. tit. 2 § 11140 *et seq*.–State Right Against Unlawful
        State Discrimination (On Behalf of the ADA Subclass Against
        County Defendants) ............................................................................64

PRAYER FOR RELIEF .......................................................................................64

FIRST AMENDED COMPLAINT

## **PRELIMINARY STATEMENT**

1.    For more than a decade, Defendants have been in the spotlight for operating a foster care system in San Bernardino County ("County") that fails to protect the foster children whose lives and wellbeing depend on it.

2.    Foster children are being abused under the supervision of San Bernardino's Child and Family Services ("CFS"), which runs the County's foster care system. In December 2022, the San Bernardino Civil Grand Jury ("Grand Jury") investigating CFS concluded that the San Bernardino child welfare system is so "complicated, secretive, and inefficient" that it is "too broken to fix" and should be "abolished."

3.    The United States and California Constitutions and federal and state statutes impose affirmative duties on CFS and the California Department of Social Services ("CDSS"), the state agency responsible for overseeing CFS, which Defendants have systematically failed to meet in operating and overseeing the County's foster care system.

4.    Specifically, Defendants must protect foster children in CFS's custody from harm and provide them with services necessary to ensure their wellbeing in the least restrictive environment.

5.    This requires Defendants to provide foster children with appropriate placements that conform to nationally recommended professional standards and adequately monitor and support foster children after placement.

6.    Defendants must also timely develop, regularly update, and effectively implement a written case plan for each foster child in CFS's custody and identify an appropriate permanent home for foster children within a reasonable period, including by petitioning for termination of parental rights within a statutorily-mandated timeframe.

7.      State and federal laws also require that Defendants provide effective services to foster children with disabilities to ensure they are afforded equal opportunity and have access to the least restrictive and integrated setting appropriate to their needs.

8.      Despite these clear constitutional and statutory mandates, all Defendants, including CDSS, have systematically failed to protect foster children in San Bernardino from harm or ensure that they are provided with services necessary under the law to ensure their wellbeing in the least restrictive environment.

9.      On Defendants' watch, Plaintiffs—foster children in the custody of CFS—have been put in inadequate and often dangerous placements, left without necessary services, and forced to languish unnecessarily in foster care for years.

10.      CFS has operated and continues to operate without regard to reasonable professional standards and has exhibited deliberate indifference to the ongoing harm it inflicts on foster children. CDSS has failed to take the necessary steps to ensure that CFS protects these children.

11.      The named Plaintiffs—Gary G., Xander B., Francesca B., Delilah B., Teddy H., Kevin E., Sam E., Henry P., David O., Greg R., and Arnold O.—are all children in CFS's custody who have suffered harm at the hands of CFS. They bring this lawsuit on behalf of all children who are now, or will be, in the custody of CFS.

12.      Plaintiffs' injuries were caused, and are being caused, by CFS's numerous policies and practices that violate the rights of foster children protected by state and federal statutes and safeguarded by the United States and California Constitutions. CDSS has not taken actions to stop these illegal activities.

13.      For example, CFS does not adequately vet foster homes before placing children, such as Plaintiffs, in them. In fact, CFS even lacks proper procedures and practices to screen out known abusers from serving as foster parents.

FIRST AMENDE COMPLAINT

14.     Once CFS places foster children in foster homes, it also fails to adequately monitor the foster children to ensure their safety. Caseworkers fail to make enough home visits to determine whether foster children are safe in their placements, as they must under federal and state laws. Moreover, the home visits that do occur are often perfunctory and do not include separate interviews with the children in line with professional standards.

15.     CFS also does not provide adequate case planning for Plaintiffs or the other foster children in its custody. CFS does not conduct timely Child and Family Team ("CFT") meetings or provide children, foster parents, and family members with individualized case plans, as expressly required under federal and state laws.

16.     CFS also lacks adequate short-term emergency placements for foster children who need them. When children like Plaintiffs enter CFS's custody, they are often forced to sleep on floors in CFS's office for days on end while their caseworkers scramble to find appropriate placements. CFS often ends up placing foster children with families who do not speak the same language.

17.     Defendants further permit CFS's caseworkers to carry caseloads that are too high to possibly meet the standards they must satisfy under the law. In fact, CFS's caseworkers often carry caseloads five or six times higher than national professional standards recommend. Caseworkers with such high caseloads cannot adequately document and implement each foster child's case plan as mandated by federal and state laws.

18.     CFS also does not provide Plaintiffs or other foster children in its custody with timely health or dental assessments. When CFS moves foster children between placements, the new foster parents often do not receive their new foster child's health files or documentation regarding their medical and psychological needs. As a result, foster children fall behind on necessary services and treatments,

sometimes left without required medication or essential therapy necessary to address their traumas and needs.

19.     CFS's systemic deficiencies expose Plaintiffs, and all foster children in the County, to a severe risk of maltreatment and future harm.

20.     CFS's policies and practices disproportionately harm foster children with disabilities, who are entitled to reasonable accommodations under the Americans with Disabilities Act and related federal and state statutes.

21.     Fully aware of CFS's systematic failings, CDSS and the other Defendants named in this First Amended Complaint have stood by and failed to exercise appropriate oversight, despite their legal obligation to do so.

22.     Plaintiffs seek declaratory and injunctive relief against Defendants to end the ongoing harm and severe risk of future harm to which Plaintiffs and thousands of other children in San Bernardino County are subjected on a daily basis. This lawsuit aims to reform CFS and provide the County's vulnerable foster children with the protection, oversight, and services they are entitled to under federal and state laws.

## JURISDICTION AND VENUE

23.     This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. The Court has jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343(a). The Court may exercise supplemental jurisdiction over the claims based on California law under 28 U.S.C. § 1367(a).

24.     This Court has jurisdiction to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

25.     Venue in this district is proper under 28 U.S.C. § 1391(b). The divisional venue is appropriate in the Riverside Division because a substantial part

FIRST AMENDE COMPLAINT

of the acts, events, or omissions giving rise to the claims outlined in the First Amended Complaint occurred in the Riverside Division.

## PARTIES

## I.    NAMED PLAINTIFFS

### A.    Gary G.[1]

26.    Gary G. (age 15 months) was born on December 8, 2021, in Apple Valley, California. He has been in CFS's custody since December 23, 2021. He lives in a Foster Family Agency ("FFA")-licensed foster home in Hesperia, California. He is a member of the General Class and ADA Subclass.

27.    Gary G. appears through his next friend, Mary Downey. Ms. Downey has served as Gary G.'s alternate caregiver since he first entered foster care. She cares for him around three times per week when Gary G.'s primary caregiver is unavailable. She is also familiar with Gary G.'s history and is dedicated to his best interests.

### B.    Xander B., Francesca B., and Delilah B.

28.    Xander B. (age 12 years) was born on August 26, 2010, in California. He has been in CFS's custody since early 2016. He currently lives in a group home in Chino County, California. He is a member of the General Class and ADA Subclass.

29.    Francesca B. (age 10 years) was born on August 4, 2012, in Apple Valley, California. Delilah B. (age 9 years) was born on April 10, 2014, in New Mexico. They have been in CFS's custody since early 2016. They currently live in an FFA-licensed foster home in Covina, California. They are members of the General Class and ADA Subclass.

---

[1] The names of Plaintiffs in this First Amended Complaint have been changed to pseudonyms to maintain the children's anonymity.

FIRST AMENDE COMPLAINT

30.    Xander B., Francesca B., and Delilah B. appear through their next friend, Colleen Strona. Ms. Strona is their paternal aunt. She is a licensed foster parent in Texas and California and fostered all three children from July 2020 until December 2022. She is familiar with their history and is dedicated to their best interests.

### C.    Teddy H.

31.    Teddy H. (age 4 years) was born on March 5, 2019, and has been in CFS's custody since April 2022. He lives in a County-licensed foster home in Victorville, California. He is a member of the General Class and ADA Subclass.

32.    Teddy H. appears through his next friend, Lori Newels. Ms. Newels is the sister of his longtime former caregiver. She is familiar with Teddy H.'s history and is dedicated to his best interests.

### D.    Kevin E. and Sam E.

33.    Kevin E. (age 13 years) and Sam E. (age 13 years) are twins born in California on January 20, 2010. They have been in CFS's custody since 2017. Kevin E. and Sam E. live in an FFA-licensed foster home in Cathedral City, California. They are members of the General Class.

34.    Kevin E. and Sam E. appear through their next friend, Kelly Reynolds Fromm, a family friend. Ms. Fromm got to know Kevin E. and Sam E. through her youngest daughter, who attended school with them and became their good friend. She is familiar with Kevin E. and Sam E.'s history and is dedicated to their best interests.

### E.    Henry P.

35.    Henry P. (age 15 years) was born in Alaska on July 13, 2007. He has been in CFS's custody since December 2019. He lives in an FFA-licensed foster home in Huntington Beach, California. He is a member of the General Class.

FIRST AMENDE COMPLAINT

36.    Henry P. appears through his next friend, Michaela Bain, a family friend. Ms. Bain sees Henry P. weekly. She is familiar with his history and is dedicated to his best interests.

**F.    David O., Greg R., and Arnold O.**

37.    David O. (age 13 years), along with his two brothers, Greg R. (age 4 years) and Arnold O. (age 2 years), have been in CFS's custody since March 2021. David O. currently lives in a group home. He is a member of the General Class.

38.    Greg R. and Arnold O. live in an FFA-licensed family foster home in Victorville, California. They have lived apart from their older brother for the past 19 months. They are members of the General Class. In addition, Arnold O. is a member of the ADA Subclass.

39.    David O., Greg R., and Arnold O. appear through their next friend, Jack Anthony. Mr. Anthony is an attorney with significant experience in litigation involving children in foster care. He is familiar with their history and is dedicated to their best interests.

**II.    DEFENDANTS**

**A.    State Defendants**

40.    Defendant Gavin Newsom is the Governor of California and is sued solely in his official capacity. He is the chief executive of California and is charged with faithfully executing the laws of the state and federal governments.

41.    Defendant California Department of Social Services is a state agency created and authorized under California law. It has general oversight for county-run child welfare agencies.

42.    Defendant Kimberley Johnson is the Director of CDSS and is sued solely in her official capacity. She oversees CDSS's policies, practices, and operations and is charged with ensuring that CFS complies with all applicable federal and state laws.

**B.    County Defendants**

43.    Defendant San Bernardino County is a local governmental entity duly authorized and formed under the laws of the State of California. The County oversees and monitors CFS.

44.    Defendant Members of the San Bernardino County Board of Supervisors ("Board of Supervisors") are sued solely in their official capacity. They are responsible for overseeing the County's policies, practices, and operations, appointing and supervising the director of CFS, and ensuring that the County complies with all applicable federal and state laws.

45.    Defendant Child and Family Services is a San Bernardino County agency created and authorized under California law. It is responsible for the safety and welfare of foster children in San Bernardino County, California.

46.    Defendant Jeany Zepeda is the Director of CFS and is sued solely in her official capacity. She oversees CFS's policies, practices, and operations and is responsible for ensuring that CFS complies with all applicable federal and state laws.

## APPLICABLE LAW

47.    Federal and state laws impose affirmative duties on state and local officials providing child welfare services that Defendants have consistently failed to satisfy in administering CFS's child welfare system.

## I.    FEDERAL AND STATE STATUTES IMPOSE AFFIRMATIVE DUTIES ON DEFENDANTS

48.    The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq.* ("AACWA") requires that state and local child welfare officials:

a)    place each child in foster care in a foster placement that conforms to nationally recommended professional standards, 42 U.S.C. § 671(a)(10);

FIRST AMENDE COMPLAINT

b)    provide each child placed in foster care with a written case plan that includes a plan to provide safe, appropriate, and stable foster care placements and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

c)    provide each child placed in foster care with the services necessary to enable the child to be returned to their biological parents' home, including services to the parents, or where reunification is impossible or inappropriate, a written case plan that ensures the location of an appropriate adoptive or other permanent home for the child and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(E);

d)    provide each child placed in foster care with a written case plan that ensures the educational stability of the child while in foster care and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(G);

e)    maintain a case review system in which each child in foster care has a case plan designed to achieve safe, appropriate, and stable foster care placements, 42 U.S.C. §§ 671(a)(16), 675(5)(A);

f)    maintain a case review system in which the status of each child in foster care is reviewed every six months by a court, or person responsible for case management, to determine the safety of the child, the continuing necessity and appropriateness of the foster placement, the extent of compliance with the permanency plan, and the projected date of permanency, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(C);

g)    maintain a case review system that ensures that for each child in foster care for 15 of the most recent 22 months, CFS petitions to

FIRST AMENDE COMPLAINT

terminate the parental rights of the child's parents, subject to statutory exceptions, and concurrently identifies, recruits, processes, and approves a qualified family for adoption, or documents compelling reasons for determining that filing such a petition would not be in the best interests of the child, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(E); and

h)    provide each child in foster care with the services necessary to protect their safety and health, 42 U.S.C. § 671(a)(22).

49.    The Americans with Disabilities Act and the Rehabilitation Act require that state and local officials:

a)    make available a full range of home and community-based placements and necessary and appropriate community-based services to ensure foster children have access to the least restrictive and integrated setting appropriate to their needs.  42 U.S.C. § 12131 *et seq.*; 29 U.S.C. § 701 *et seq.*; 28 C.F.R. § 35.101, *et seq.*; 45 C.F.R. § 84.1, *et seq.*

50.    The California Government Code and the California Welfare and Institutions Code impose liability on public entities for failing to discharge mandatory duties, including:

a)    completing "[a] written case plan . . . within a maximum of 60 days of the initial removal of the child," Cal. Welf. & Inst. Code § 16501.1(e);

b)    updating the case plan "no less frequently than once every six months" and ensuring "[e]ach updated case plan . . . include[s] a description of the services that have been provided to the child under the plan and an evaluation of the appropriateness and effectiveness of those services," *id.*;

FIRST AMENDE COMPLAINT

c) developing a case plan that "identif[ies] specific goals and the appropriateness of the planned services in meeting those goals," Cal. Welf. & Inst. Code § 16501.1(g)(2);

d) developing a case plan that "include[s] provisions for the development and maintenance of sibling relationships," Cal. Welf. & Inst. Code § 16501.1(g)(6);

e) developing a case plan that "ensure[s] the educational stability of the child while in foster care," Cal. Welf. & Inst. Code § 16501.1(g)(8);

f) if the child's permanency goal is reunification, then developing a case plan that "describe[s] the services to be provided to assist in reunification," Cal. Welf. & Inst. Code § 16501.1(g)(10);

g) if the child's permanency goal is not reunification, then developing a case plan that "include[s] a statement of the child's wishes regarding their permanent plan and an assessment of those stated wishes," Cal. Welf. & Inst. Code § 16501.1(g)(15);

h) ensuring "that a child in foster care . . . receive[s] administrative reviews periodically but no less frequently than once every six months" that "determine the appropriateness of the placement, the continuing appropriateness and extent of compliance with the permanent plan for the child, the extent of compliance with the case plan, and adequacy of services provided to the child." Cal. Welf. & Inst. Code § 16503(a); *see generally* Cal. Gov't Code § 815.6.

51. The California Government Code and California Code of Regulations also require that:

a)     programs or activities conducted, operated, or administered by the state or by any state agency funded directly by the state or receiving financial assistance from the state "meet the protections and prohibitions contained in Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12132), and the federal rules and regulations adopted in implementation thereof except that if the laws of this state prescribe stronger protections and prohibitions, the programs and activities [receiving state funding] shall be subject to stronger protections and prohibitions," Cal. Gov't Code § 11135(b);

b)     "[n]o person in the State of California shall, on the basis of . . . a physical or mental disability, be unlawfully denied the benefits of, or be unlawfully subjected to discrimination under any program or activity funded by the State or receiving any financial assistance from the State," Cal. Code Regs. tit. 2, § 11153; and

c)     recipients of state funding provide disabled persons with services that are as effective in affording an equal opportunity to obtain the same result, gain the same benefit, or reach the same achievement level as those provided to others. In some cases, identical treatment may be discriminatory. Cal. Code Regs. tit. 2, § 11154(c).

## II.  THE UNITED STATES AND CALIFORNIA CONSTITUTIONS IMPOSE ADDITIONAL AFFIRMATIVE DUTIES ON DEFENDANTS

52.  The Fourteenth Amendment of the United States Constitution guarantees to each child in state custody substantive due process rights and requires state and local child welfare officials to:

FIRST AMENDE COMPLAINT

a) ensure that each child placed in foster care is free from the foreseeable risk of physical, mental, and emotional harm;

b) ensure that each child placed in foster care receives the services necessary to ensure their physical, mental, intellectual, and emotional wellbeing in the least restrictive environment;

c) provide each child placed in foster care with conditions, treatment, and care consistent with the purpose and assumption of custody;

d) ensure that each child placed in foster care is not maintained in custody longer than is necessary to accomplish the purpose of custody; and

e) provide each child placed in foster care with reasonable efforts to obtain an appropriate permanent home and family within a reasonable period.

53. The First Amendment's right of association and right to a permanent family, along with the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's right to due process require state and local child welfare officials to:

a) provide reasonable efforts to obtain a permanent home and family.

54. Article I, Section 7(a) of the California Constitution guarantees that:

a) a "person may not be deprived of life, liberty, or property without due process of law." The protections of substantive due process under California law have at least the same scope and purposes as those under the United States Constitution.

-18-

FIRST AMENDE COMPLAINT

## FACTS

I. **CFS ENGAGES IN NUMEROUS POLICIES AND/OR PRACTICES THAT VIOLATE THE RIGHTS OF FOSTER CHILDREN IN SAN BERNARDINO COUNTY AND EXPOSE THEM TO A SEVERE RISK OF FUTURE HARM**

A. **CFS Has Spent the Last Decade Embroiled in Controversy**

55.    The San Bernardino Grand Jury "is an independent civil watchdog agency that investigates County agencies, towns and cities, and special districts within San Bernardino County," in line with California Penal Code, section 925.

56.    For most of the past decade, the Grand Jury has investigated CFS, and each year it has done so "it has discovered problems and issues." For example, the Grand Jury concluded in 2016 that CFS caseworkers have "heavy caseloads" and "tremendous turnover."

57.    In 2017, the Grand Jury noted that caseloads remained "excessively high, especially in the High Desert." In 2019, the Grand Jury further reiterated that "[e]xtremely heavy caseloads are especially a problem because of under-staffing and an increase in growth of the San Bernardino County's population." The 2016 and 2019 reports also noted high caseworker turnover.

58.    During that period, CFS was made further aware of these problems through litigation and investigative reporting. In fact, Fox News aired a multi-part exposé on CFS titled "The Children are Dying" in 2015.

59.    In 2022, the Grand Jury found that the average caseworker caseload is around 70 to 90 cases per worker, that "substantiated foster children abuse cases have increased every year from 2019 through 2021," and that the number "of substantiated sexual abuse and physical abuse cases is eye-opening."

60.    The Grand Jury concluded that CFS is so "complicated, secretive, and inefficient" that it is "too broken to fix" and should be "abolished."

61.    The Grand Jury's reports are only the latest in a series of investigations into Defendants' long-standing failure to operate a foster care system that protects the foster children whose lives and wellbeing depend on it. The California Attorney General has investigated "potential systemic breakdowns." Investigative journalists have also revealed that foster children have been abused under CFS's supervision. Former caseworkers have even reported that CFS has placed foster children with known sexual predators.

**B.    CFS Fails to Adequately Vet Foster Homes or Monitor Foster Children Once Placed**

62.    When CFS assumes legal custody of children, CFS is required to monitor them to properly ensure their safety and wellbeing.

63.    Part of this responsibility involves properly vetting foster parents, foster homes, and their inhabitants before entrusting foster children to their care. However, the Grand Jury has found that "CFS has no comprehensive and complete background check/vetting system for" foster parents and foster homes. As a result, "[b]ackground checks of [foster homes] often miss unknown or undisclosed boyfriends or relatives who visit the home." In extreme cases, CFS has even placed children with known, registered sex offenders. The Grand Jury found these procedures "subject foster children to abusive settings."

64.    Another part of this responsibility requires CFS's caseworkers to regularly—and thoroughly—visit foster homes to ensure the foster children living there are safe.  In fact, caseworkers must visit foster children face-to-face at least once per month, and more than half of these visits should occur at the foster home. And, during these visits, foster children must receive personalized attention from their caseworker. If this does not happen, foster parents can "hide abuse problems," leading to "substantiated sexual and physical abuses to foster children."

65.     Despite these risks, the Grand Jury has found that caseworkers "do not visit all children monthly . . . and there are insufficient and inadequate home inspections during visits." Indeed, caseworkers often conduct "fly-by" visits without "interview[ing] the child or look[ing] into rooms or closets." The Grand Jury found "that these brief interviews [] led to substantiated abuse cases."

66.     CFS's lack of adequate vetting procedures for foster homes and failure to ensure caseworkers conduct appropriate visits to children in their placements leave foster children at substantial risk of experiencing harm and maltreatment in care.

### C.     CFS Does Not Provide Adequate Case Planning

67.     Federal law requires CFS to provide foster children with a detailed, individualized case plan. These plans are necessary to effectively engage family members and tailor services to adequately address their needs and the needs of their children. CFS must also periodically review these case plans—at least once every six months—until a child's case is resolved and the child has been discharged from custody.

68.     Federal and state law require that "[a] written case plan [] be completed within a maximum of 60 days of the initial removal of the child." The case plan must include, among other things, "[b]ehaviorally specific goals and objectives and services that will help the parents achieve a safe home for the child," a "[s]chedule of the social worker (SW) contacts with the child, family, and caregivers," "[p]ermanency plans," and "[a]ssurances of educational stability while the child is in out-of-home care."

69.     State law further requires that foster children over 12 years old "be given the opportunity to participate in the development of his/her case plan, review, sign and receive a copy of the case plan."

FIRST AMENDE COMPLAINT

70.     CFS's own internal policy handbook adds that the caseworker "should involve the parent(s), child and/or additional family and community resource persons in the development of the case plan." This policy emphasizes a shift "from the [caseworker] dictating the case plan to the parents and/or children to a more collaborative effort where the [caseworker] encourages their participation in the development of the case plan."

71.     CFT meetings represent one tool for caseworkers to collaborate with parents and children in case planning. CFT meetings should include foster children, their family members, professionals, natural community supports, and other individuals invested in the child's success.

72.     These meetings must occur within 60 days of a child's entry into foster care, at least once every six months thereafter for children not receiving specialized mental health services, and at least once every 90 days for children receiving such specialized care.

73.     All available evidence indicates that, despite statutory requirements, CFS's caseworkers do not complete case plans on time or with all the required information, and CFT meetings do not occur on time with all the necessary stakeholders.

74.     In a 2017 County Self-Assessment, CFS observed that families' "voices are not being heard." In essence, case plans are "cookie cutter," "not update[d] . . . [to reflect the child's] progress and new needs," and "not tailored to the family and child's needs." At the same time, CFS reflected on a "[n]eed for more CFTs— routinely." Above all, CFS noted that caseworkers' lack of engagement stemmed from high caseloads, which inhibited caseworkers' "ability to engage in ongoing assessment[s]."

75.     Many foster parents, family members, and foster children have never seen the foster child's case plan.

FIRST AMENDE COMPLAINT

76.    What is more, CFS caseworkers are not conducting timely CFT meetings. And, when they do, caseworkers do not show or discuss the foster child's case plan with the attendees.

77.    Finally, CFS has observed several other issues interfering with its caseworkers' ability to connect with foster children and their biological and foster families. First, CFS's caseworkers often "do not speak the same language as the family." Second, CFS noticed its caseworkers "were quick to label parent[s] as 'resistant.'" And third, CFS found that its caseworkers were "missing cultural humility and trauma-informed components to providing services."

78.    CFS's lack of timely, appropriate case planning, by itself, places foster children at risk of serious and ongoing harm. This serious risk is aggravated by the fact that CFS does not regularly include all required stakeholders, such as relatives, foster parents, and family friends in the case planning process. At bottom, these issues prevent CFS from evaluating foster children's service needs and effectively planning for permanency as the law requires.

**D.    CFS Lacks Short-Term Emergency Placements**

79.    Federal law and widely accepted professional standards require CFS to place each foster child in the most appropriate and least restrictive placement that best suits the child's needs. *See* 42 U.S.C. § 622(b)(8)(A)(iii); 42 U.S.C. § 675(5)(A). Extensive child welfare literature also emphasizes the need to choose each child's placement based on all information available about the child and the need to consider all available information carefully.

80.    This means that CFS must have an adequate array of placements to properly accommodate foster children with varying levels of needs. And, by extension, CFS must properly assess each foster child's needs before placing them with a foster family or facility, matching them with particular homes and facilities based on fit rather than availability.

FIRST AMENDE COMPLAINT

81.    Despite these requirements, CFS lacks adequate short-term emergency placements for children, so when children first enter care, CFS often has no other placement for them than a local CFS office. The Grand Jury found that foster children remain in these offices for "days or weeks at a time."

82.    CFS recently acknowledged that "[a] certain number of children and youth, particularly those with complex needs and significant behavioral/emotional problems, spend nights in [CFS] offices."

83.    These offices lack essentials such as proper beds, bathrooms, and kitchens. Consequently, children "sleep on the floor, cots, and other locations" and eat from "fast food restaurants" that lack nutritional value. What is more, children with special needs often cannot receive any of their medication or other necessary services.

84.    These offices also lack basic safety features. There are issues with theft and assault. And, presumably due to inadequate supervision, foster children often rifle through caseworkers' desks to see other children's confidential materials.

85.    CFS's placement of foster children in its offices because of a lack of short-term emergency placements puts these children at substantial risk of experiencing maltreatment in care. As the Grand Jury concluded, these offices are "unsafe, unsanitary, and unacceptable."

**E.    CFS Does Not Provide Necessary Health Assessments or Health Services to Children**

86.    Federal and state laws require CFS to provide foster children, along with their families, adequate services so they can be successfully reunified with their families or placed in another permanent family. Failure to provide necessary services to foster children often leads to escalating behavioral problems, failed placements, and permanent harm to foster children.

FIRST AMENDE COMPLAINT

87.    To provide adequate services to foster children, federal and state laws require CFS to provide adequate and timely medical, dental, and psychological assessments to diagnose what services they need. However, CFS is persistently failing to provide these assessments. In December 2022, only 48.8% of foster children received timely medical examinations, and only 50.4% received timely dental examinations.

88.    The Grand Jury also found foster children are not, as required, "medically and behaviorally examined before every placement in a [new foster home]." Instead, foster children "are only medically and behaviorally assessed when the [caseworker] determines that [it] is necessary."

89.    And, for foster children placed in FFAs, CFS does not share critical medical information, including Medi-Cal cards, "in a timely manner." As a result, the FFA foster homes often cannot schedule initial medical visits within the first 30 days of placement, as required by law.

90.    What is more, the Grand Jury also concluded that CFS provides "[i]nadequate medical and mental health services," such that "the current level of mental health services for foster children is severely lacking."

91.    CFS lacks "evaluation tools, assessment guidelines, therapy services and experienced mental health professionals," particularly those who "specialize in helping traumatized foster children." Additionally, "CFS lacks sufficient community-based mental health resources."

92.    CFS is aware these issues result from its other failed policies and practices. Indeed, CFS has acknowledged that "[c]aseload size impact[ed] [caseworkers'] ability to engage in on-going assessment[s] of child/parents' progress in services."

93.    The lack of timely and adequate assessments and services results from CFS's long-standing actions and inactions. Indeed, CFS knows that some of its

1    policies and practices, such as allowing high caseworker caseloads, expose foster

2    children to a substantial risk of future harm.

3    **F.    CFS Fails to Protect Foster Children From Maltreatment in Care**

4    94.    Foster care is supposed to protect children who have already suffered

5    trauma at home from further harm. However foster children in San Bernardino

6    County experience high rates of maltreatment in care.

7    95.    Indeed, the Grand Jury found that "substantiated foster children abuse

8    cases have increased every year from 2019 through 2021," including "significant

9    amounts of substantiated sexual abuse and physical abuse." And available data

10   shows that in 2022, CFS's foster children experienced maltreatment at a rate of 12.40

11   victimizations per 100,000 days in care, which is far higher than California (7.42,

12   2022) and national (9.07, 2020) averages.

13   96.    Unsurprisingly, San Bernardino County recently ranked second-worst

14   out of 58 counties in California. And if San Bernardino County were a state, it would

15   rank 12th worst in the United States, based on 2019 data.

16   97.    Despite these alarming figures, the Grand Jury found that CFS has "no

17   proactive measures to keep foster children from entering abusive" homes and has

18   engaged in "very little proactive efficient monitoring of these homes once the

19   placement has been made."

20   98.    The high rate of maltreatment of foster children in CFS's custody is a

21   direct result of CFS's deficient policies and practices, particularly CFS's inadequate

22   vetting and monitoring of foster homes and foster parents. As the data show, these

23   policies and practices expose foster children to a substantial risk of future harm.

24   **G.    CFS Fails to Place Foster Children Into Permanent Placements**

25   99.    Foster care is intended to be temporary. Research has shown that the

26   longer a child remains in foster care, the less likely it is they will be reunified or

27   adopted. In turn, the longer a child waits for a permanent placement, the less likely

28

-26-

FIRST AMENDE COMPLAINT

they are to complete their education or form healthy relationships. Prompt permanency planning, thus, ensures that children leave foster care as quickly as possible and are placed in stable, permanent homes.

100.    Federal law, in turn, requires CFS to expeditiously place foster children in permanent homes. Indeed, when children have been in foster care for 15 of the last 22 months, CFS is required by law to petition to terminate the parental rights of the child's parents so that the child can be adopted, unless the child's case plan documents compelling reasons why termination would not be in the child's best interests or the child's case qualifies for a statutory exemption.

101.    Available data, however, shows that foster children in CFS's custody languish in foster care for much longer than federal law permits. Children in the County spend an average of 551 days in custody, 104 days longer than the national average.

102.    CFS has itself admitted that "[p]ermanency is not being addressed" and "performance has gotten worse since 2012." Whereas 35.4% of the children entering foster care in 2012 achieved permanency within 12 months, only 29.1% of children entering foster care in 2016 achieved permanency within that timeframe.

103.    These figures have continued to deteriorate. By 2019, only 23.9% of children entering care achieved permanency within 12 months, compared to around 38.3% for foster children nationally.

104.    Moreover, children in CFS's custody are about 50% more likely to "age out" of foster care, without ever receiving a permanent home, than other foster children around the country (14.9% compared to 9% nationally, based on 2021 data).

105.    CFS has recognized that "[a] crucial step in reunifying children within 12 months of foster care entry is early engagement of parents," which CFS is failing to adequately do. In other words, CFS's policies and practices, particularly its lack of adequate case planning and failure to conduct timely and appropriate CFT

1  meetings, are directly contributing to its failure to attain permanency for the foster
2  children in its custody.

3      106.  The lack of permanency outcomes for foster children, which arise
4  because of CFS's deficient policies and practices, expose foster children in the
5  County to a substantial risk of future harm.

6      **H.  CFS Permits Its Caseworkers to Carry Dangerously High**
7      **Caseloads**

8      107.  CFS has a constitutional duty to adequately supervise the foster
9  children in its custody to ensure they are safe and receive necessary services. To do
10 this, CFS must recruit and retain enough caseworkers to maintain caseloads that
11 enable caseworkers to do their job.

12     108.   The Child Welfare League of America ("CWLA"), a national coalition
13 of agencies that develops child welfare policies, recommends that caseworkers
14 maintain caseloads of between 12 and 15 children in out-of-home care. Similarly,
15 the Council on Accreditation ("COA"), a national professional licensing
16 organization, also recommends that caseworkers maintain caseloads between 12 and
17 15 children.

18     109.   In the County, however, CFS permits its caseworkers to carry caseloads
19 that far exceed these recommended standards. In 2022, the Grand Jury found that
20 CFS allows average caseloads of around 70 to 90 children per caseworker.

21     110.   CFS did not refute or deny those figures in its response to the Grand
22 Jury. In 2019, CFS acknowledged that its caseworkers had an average caseload of
23 42 foster children. Caseloads are likely even higher in remote regions, such as the
24 High Desert.

25     111.   These average caseload figures include recently hired caseworkers
26 who, under recognized professional standards, should carry only lighter caseloads.
27 In fact, it takes up to two years to train a new caseworker, during which experienced
28

caseworkers often must shoulder higher caseloads. As the Grand Jury explained, field offices with many newly hired caseworkers are often forced to transfer cases to neighboring offices with more experienced workers, and consequently, more experienced caseworkers must maintain caseloads far higher than average.

112.    Making matters worse, caseworkers spend an average of five working days per month on purely administrative tasks, leaving only 15 working days to actively supervise, plan for, and ensure services for the foster children in their care.

113.    A major reason for these high caseloads is that CFS is experiencing "a high turnover rate among [caseworkers]" while struggling to recruit new caseworkers, who are deterred by "long commutes, poor training, and poor supervision." As a result, several of CFS's field offices are "sparsely populated in terms of personnel" and do "not have enough workers to keep up with workload demands." In fact, CFS has "[i]nsufficient staffing levels to provide quality services."

114.    Ultimately, the Grand Jury concluded that it is "impossible" for caseworkers to monitor so many children properly, finding that CFS's "mission . . . has been unsuccessful . . . primarily due to personnel issues and large caseloads."

115.    High caseloads prevent CFS's caseworkers from adequately assessing a child's safety or wellbeing, developing individualized case plans, facilitating reunification services, placing children in appropriate placements, or deciding when to petition to terminate parental rights, all of which are required under state and federal laws. Manageable caseloads can exist only when an agency develops and maintains an adequately-funded and well-planned child welfare system that aggressively recruits, trains, and retains caseworkers.

116.    Defendants, by contrast, have consistently failed to develop such a system, contributing to child maltreatment in care, lack of adequate services, and

FIRST AMENDE COMPLAINT

inadequate permanency planning, thereby exposing foster children in the County to a substantial risk of future harm.

## I.   CFS Fails to Provide Effective Services to Children with Disabilities

117.   CFS's illegal policies and practices disproportionately harm foster children with disabilities. In particular, CFS's lack of adequate case planning and its untimely and inadequate provision of services prevent children with disabilities from receiving the specialized care they need to succeed in foster care.

118.   For instance, CFS's failure to conduct timely health assessments—especially those related to mental health—delays the prompt identification of a child's disability. Making matters worse, CFS does not ensure foster children are medically and behaviorally assessed before it places them in new foster homes.

119.   Meanwhile, CFS's failure to provide necessary services, including "therapy services and experienced mental health professionals," prevents disabled children from receiving adequate treatment. Delays in passing along Medi-Cal cards between placements further prevent disabled children from receiving timely services, even if such services would otherwise be available.

120.   CFS's failure to provide health assessments and services is made even worse by its inadequate case planning practices, including its deficient CFT meetings, which do not adequately track disabled children's needs and progress. Indeed, foster parents sometimes receive foster children who have disabilities and need specialized care without having ever seen the child's case plan or medical files.

121.   CFS's lack of assessments, services, and case planning is compounded by its other systemic deficiencies—high caseworker caseloads, a lack of short-term emergency placements, inadequate vetting of foster homes, and monitoring of children later placed in those foster homes all disproportionately expose foster children with disabilities to severe risk of future harm.

FIRST AMENDE COMPLAINT

122.    These failings are particularly alarming considering the general recognition by public health authorities, such as the Centers for Disease Control and Prevention, that providing timely interventions to children with disabilities "can change a child's developmental path and improve outcomes for children, families, and communities."

123.    By failing to safely plan with the parents, foster parents, and/or loved ones of foster children with disabilities, or to make reasonable modifications to their case planning procedures and practices, CFS unnecessarily prevents children with disabilities from experiencing foster care in a way that federal and state law requires—in the least-restrictive, most family-like setting, with adequate services.

## II.    THE REMAINING DEFENDANTS HAVE VIOLATED THE RIGHTS OF FOSTER CHILDREN IN SAN BERNARDINO COUNTY AND EXPOSED THEM TO A SEVERE RISK OF FUTURE HARM BY FAILING TO EXERCISE ADEQUATE OVERSIGHT OVER CFS

### A.    The County Defendants Have Failed to Exercise Adequate Oversight

124.    Defendant San Bernardino County is specifically tasked with overseeing and monitoring CFS.

125.    Defendant Members of the Board of Supervisors are responsible for overseeing the County's policies, practices, and operations, appointing and supervising the director of CFS, and ensuring that the County complies with all applicable federal and state laws.

126.    Defendant Jeany Zepeda is the Director of CFS and oversees CFS's policies, practices, and operations. She is responsible for ensuring that CFS complies with all applicable federal and state laws. Defendants San Bernardino County, Members of the Board of Supervisors, and Jeany Zepeda, together with CFS, are referred to as the "County Defendants."

127.   The County Defendants have failed to exercise adequate oversight and ensure that CFS's practices and procedures comply with federal and state laws, exposing foster children in San Bernardino County to a severe risk of future harm.

**B.    The State Defendants Have Failed to Exercise Adequate Oversight**

128.   Defendant CDSS is specifically tasked with overseeing all county-run child welfare agencies in California. CDSS "oversees the efforts of counties to protect California children from abuse and neglect." The CDSS services division "provides leadership and oversight of county and community agencies in the implementation of child welfare services programs through regulations, training, technical assistance, incentives, and program evaluations." At the same time, CDSS's licensing division oversees and regulates all foster and group homes in California.

129.   One of CDSS's specific oversight responsibilities is to ensure that counties place foster children in the least restrictive, most family-like environment, in line with federal law.

130.   Defendant Kimberly Johnson is the Director of CDSS and is responsible for overseeing CDSS's policies, practices, and operations. She is specifically charged with ensuring that CFS complies with all applicable federal and state laws.

131.   Defendant Gavin Newsom is the Governor and chief executive of California and is charged with faithfully executing the laws of the state and federal governments. Together, CDSS, Kimberly Johnson, and Gavin Newsom are referred as the "State Defendants."

132.   The State Defendants have violated federal and state mandates.

133.   CDSS has faced scrutiny from state auditors. For example, in 2011, the California State Auditor noted that CDSS was not adequately preventing registered

FIRST AMENDE COMPLAINT

sex offenders from "inappropriately living or working in its licensed facilities or in the homes of foster children."

134.    In 2015, auditors again found deficiencies in CDSS's process for preventing sex offenders from living in licensed facilities or homes. In 2017, auditors also concluded that CDSS was not "obtain[ing] or review[ing] all appropriate information before allowing individuals access to facilities."

135.    When the Grand Jury recommended that CFS implement an independent oversight committee, CFS responded that such a request would be "redundant" because CDSS "is tasked with the responsibility of monitoring and providing objective recommendations to county child welfare agencies." Indeed, CFS claims it "implements any recommendations that CDSS may have in this regard."

136.    The State Defendants are not taking the necessary steps to oversee and rein in CFS to protect foster children. They have long been aware of CFS's failures yet have not taken the necessary steps to correct these failures, which continue to harm the children in CFS's custody. The Grand Jury noted in 2022 that "CFS has no local accountability, which allows them to operate behind an air of confidentiality, [which makes] any accountability for their actions [] extremely difficult."

## III.    THE NAMED PLAINTIFFS ARE AT SEVERE RISK OF FUTURE HARM AS A RESULT OF CFS'S ILLEGAL PRACTICES AND PROCEDURES AND THE STATE AND COUNTY DEFENDANTS' FAILURE TO EXERCISE ADEQUATE OVERSIGHT

137.    The following named Plaintiffs' cases illustrate how Defendants' collective failures expose foster children in CFS's custody to a substantial risk of harm and actual harm.

FIRST AMENDE COMPLAINT

## A.    Gary G.

138.    Gary G. was born on December 8, 2021, and immediately placed in a Neonatal Intensive Care Unit ("NICU"), where he remained for about two weeks. He was connected to a ventilator due to his low Apgar score, difficulty breathing, syphilis exposure, and potential marijuana exposure.

139.    Gary G.'s biological mother is incarcerated in Texas, and his biological father, who served 20 years in prison for aggravated robbery, is homeless and unemployed, residing in California. On December 24, 2021, Gary G. entered CFS's custody. CFS then placed him with his current foster mother, who has an FFA-licensed foster home in Hesperia, California.

140.    Gary G's medical needs are complex and require ongoing treatment. He has an undersized head and vision issues, likely due to testing positive for syphilis at birth. To manage his condition, his foster mother takes him to Loma Linda University Medical Center every month for treatment. He has blood tests every two months, has had a preventive MRI, and has received an electroencephalogram. He needs ongoing treatment from a neurology specialist and an eye specialist.

141.    Gary G. also experiences delayed language and motor skills development and suffers from muscle stiffness. He cannot yet wave or point, has delayed babbling, and previously wore leg braces to treat tip-toe walking. He requires infant speech, occupational, and physical therapy to aid his development.

142.    Still, Gary G. has faced difficulty obtaining these necessary health services. His foster mother must travel up to two hours, multiple times per week, to take him to appointments with doctors and therapists. And Gary G. has been unable to receive occupational and physical therapy simultaneously.

143.    In addition to these challenges, CFS has failed to adequately monitor Gary G. In just over a year, CFS has assigned Gary G. five different caseworkers, with none lasting for more than two months.

FIRST AMENDE COMPLAINT

144.   Together, those caseworkers have made only six in-home visits, with the last in October 2022. All other visits occurred at CFS's offices. CFS has not held a single CFT meeting for Gary G., and Gary G.'s caseworkers have failed to learn about his case plan or provide a copy to his foster mother despite her repeated requests.

145.   In February 2022, clinicians recommended referring Gary G. to Inland Regional Center ("IRC") to improve healthcare quality and reduce travel time for treatment. Gary G.'s caseworkers still have not facilitated the referral, despite repeated requests from his foster mother.

146.   Gary G.'s caseworkers have ignored his foster mother's calls, texts, and emails, and one caseworker failed to submit her IRC referral request. In March 2023, IRC placed Gary G's case on "inactive status" after never receiving a response from his caseworker.

147.   Gary G.'s permanency goal is reunification with his father, who is homeless, unemployed, and on probation for domestic violence charges. Despite this, CFS maintains that Gary G.'s father poses no safety risk to him. CFS also does not have a concurrent plan for him, as federal law requires.

148.   Gary G.'s father does not appear to be following the requirements of his reunification plan. He has not provided proof of completing the required parenting and domestic violence classes that his case plan requires and has not submitted proof for all the necessary drug tests. And, he has attended only 40 out of 92 scheduled visits.

149.   Gary G.'s father often exhibits erratic behavior during those visits and smells like marijuana. Gary G., in turn, has often appeared noticeably stressed while visiting his father. During one visit, he covered Gary G.'s head with a blanket, which caused Gary G. to suffer a head injury and visit Urgent Care. Gary G.'s foster mother

has often warned CFS about these issues, but only once did CFS send a caseworker to supervise a visit with Gary G.'s father.

150.    Indeed, Gary G. will likely need significant services for the next several years as healthcare providers monitor his improvement in areas such as head size, language and motor skills, and muscular development.

151.    Gary G. needs a stable, permanent home, but CFS is not working to achieve that goal as required by state and federal law. CFS is not working with Gary G.'s father to determine whether he can provide a home for Gary G., nor is it working to develop an alternative concurrent plan, as federal law requires.

**B.    Xander B., Francesca B., and Delilah B.**

152.    Xander B. (born August 26, 2010), Francesca B. (born on August 4, 2012), and Delilah B. (born on April 10, 2014) have been in and out of foster care since 2014 and continually in CFS's custody since early 2016. All three children are siblings. Their mother died of a suspected drug overdose around May 2015. Around that same time, their father began sexually abusing Francesca B. and Delilah B., and possibly Xander B. as well.

**i.    2016 through July 2020: early placements.**

***Xander B.***

153.    CFS placed Xander B. in three or four foster homes during his first few months in care. Each of these placements failed because CFS failed to identify foster parents who were prepared to care for Xander B.'s needs. In late 2016, CFS placed Xander B. in a group home in Desert Hot Springs, California, where he remained until 2020.

154.    During the time Xander B. was at the group home, CFS assigned him four different caseworkers. These caseworkers rarely visited him in person and instead checked in with him over the phone roughly once per month. Xander B. had only one CFT meeting during his four years at the group home.

FIRST AMENDE COMPLAINT

155.   Moreover, the group home where CFS placed Xander B. was neither clean nor safe. Children wore dirty clothes, while the beds appeared to have bedbugs. Physical altercations were common among the children. And, Xander B. had many of his belongings stolen.

156.   Around that period, doctors discovered that Xander B. suffers from Nephrotic syndrome, a type of kidney disease requiring daily medication and a low-sodium diet. From 2018 to 2020, he was hospitalized three times for this condition.

157.   In the years since, Xander B. has also been diagnosed with a host of different behavioral conditions, including Intermittent Explosive Disorder, Oppositional Defiance Disorder ("ODD"), Post Traumatic Stress Disorder ("PTSD"), Attention Deficit Hyperactivity Disorder ("ADHD"), and Major Depressive Disorder.

158.   The group home where CFS placed Xander B. did not properly treat his ailments. They did not accommodate his dietary needs and required him to buy supplemental food using the allowance the group home gave him. Further, neither CFS nor the group home has secured an Individualized Education Plan ("IEP") or any other educational aid for him.

### Francesca B. and Delilah B.

159.   Between 2016 and 2020, CFS placed Francesca B. in at least 8 and potentially up to 12 different foster homes. During that same period, CFS placed Delilah B. in at least 7 and potentially up to 11 different foster homes. While CFS sometimes placed the sisters together, it often separated them.

160.   Between 2016 and 2020, Francesca B. and Delilah B. had at least four caseworkers. Those caseworkers collectively held only two CFT meetings in four years and failed to ensure that the girls had ongoing visits with each other (when apart) or with their brother.

161.    At one point, CFS placed Francesca B. and Delilah B. with foster parents who repeatedly beat the girls and held their heads underwater. In one altercation, the foster parents threw Delilah B. against a wall. As a result of this incident, Delilah B. suffered blunt force trauma to her head and left side, had cuts all over her head and neck, and broke a bone in her hand.

162.    The abuses by their foster parents continued for months before the girls' caseworker finally intervened. When Delilah B. did, eventually, visit the hospital, the doctor recommended a follow-up visit within 30 days to ensure proper healing, but the caseworker never brought her back. As a result, Delilah B. still walks with a limp and favors her non-broken hand.

163.    Because of the abuse by their foster parents, both girls have lasting psychological injuries, and Delilah B. still struggles with water-related activities such as showering. In addition, the girls have ongoing trauma from their father's sexual abuse. CFS has not provided them with the necessary services to deal with the traumas they have experienced.

### i.    July 2020 through December 2022: placement with the Stronas.

164.    Colleen Strona and Thomas Strona, the children's aunt and uncle, sought to care for them as early as 2018, but CFS took over two years to complete the necessary paperwork. In July 2020, CFS finally placed all three children with the Stronas in Texas. The caseworkers provided the Stronas with incomplete health and education information and did not provide them with any of the children's case plans.

165.    While in the Stronas' care, all three children required substantial medical, behavioral, and educational services. Xander B. struggled in school and exhibited frequent anger outbursts. At one point, Xander B. also acted out sexually toward his younger sisters. A psychiatrist eventually prescribed him medication for

FIRST AMENDE COMPLAINT

ADHD. In addition, he requires medication and a specialized diet for his Nephrotic syndrome.

166.    Francesca B. also struggled academically and socially. She had trouble discussing her feelings and would often shut down completely. She would also lie and steal. A psychiatrist diagnosed her with PTSD because of her past traumas.

167.    Delilah B. also struggled academically, eventually having to repeat the first grade. She also had behavioral outbursts in which she would break objects. A psychiatrist diagnosed her with dyslexia, ODD, ADHD, and PTSD.

168.    Around mid-2022, Delilah B. received a brain scan, which detected that she was experiencing brain tremors. Her psychiatrist prescribed anti-seizure medication and recommended continued evaluations. She also concluded that Delilah B. would require elevated care and likely need a caretaker for the rest of her life.

169.    During this time, the children had infrequent contact with their two different CFS caseworkers. Caseworker visits occurred monthly over the telephone and lasted 10 to 15 minutes. During these calls, the caseworkers often forgot the children's names and repeatedly asked about their biological parents, despite several reminders that their father was a sexual predator and their mother was dead.

170.    Apart from these phone visits, caseworkers never provided the Stronas with the children's case plans and never held a single CFT meeting for either Xander B. or the girls. CFS's caseworkers were uncommunicative and did little to help the children obtain services.

171.    Caseworkers also often ignored the Stronas' calls, including warnings that Xander B. had stolen alcohol and had made a suicidal gesture. CFS's caseworkers also never provided Delilah B.'s psychiatrist with the necessary medical records and neglected to file the required paperwork for Delilah B. to receive her ADHD and anti-seizure medication.

FIRST AMENDE COMPLAINT

172.   Without adequate help from CFS, the Stronas decided that they could not continue caring for the three siblings. In December 2022, CFS transferred Xander B. to a group home in Chino County, California, and placed Delilah B. and Francesca B. in an FFA-foster home in Victorville, California.

### iii.   December 2022 through the present: recent placements.

173.   The Stronas provided CFS with detailed medical information for all three children before releasing them. Despite this, Xander B. spent his first 30 days in his current home without his Nephrotic syndrome medication and is still not receiving medication for ADHD.

174.   Francesca B. and Delilah B.'s placement in a foster home in Victorville was disrupted when the foster family's dog attacked Delilah B., requiring six stitches on her face. CFS kept the girls in that home for three more weeks before moving them. The girls currently reside in an FFA-foster home in Covina, California. Although Ms. Strona sent CFS all of their paperwork, CFS has yet to forward any of it to the new foster parents.

175.   CFS has not developed a permanent or concurrent plan for these children, despite being required to do so by federal law. In addition, CFS is not providing all of the ongoing services Xander B. requires, which include a specialized diet and medication for his nephrotic syndrome, medication for ADHD, and therapeutic services for various behavioral issues. Both girls also require substantial ongoing services, which they are not receiving, and Delilah B. needs medication for seizures and medication.

### C.   Teddy H.

176.   Teddy H. was born on March 5, 2019, and has been in CFS's custody since April 2022 after police raided his mother's home and found methamphetamine within close reach of him. He lives in a County-licensed foster family home in the County. Teddy H.'s biological father also has an extensive criminal history.

177.   CFS first placed Teddy H. with a foster family in Victorville, California. About two weeks later, CFS moved Teddy H. to live with an adult cousin. At that placement, Teddy H. received a referral to IRC for speech therapy. After three months in that placement, CFS placed Teddy H. with his stepmother in Palmdale, marking his third placement in just four months.

178.   Teddy H.'s stepmother had cared for him for most of his life before he entered foster care. Even so, Teddy H.'s stepmother could not follow up on the IRC referral because she was not his educational rights holder.[2] As a result, Teddy H. could not receive the speech therapy he required.

179.   In March 2023, CFS removed Teddy H. from his stepmother's home and placed him with another family in Victorville. As a result of CFS's actions, Teddy H. has lost contact with his stepmother, who had been his primary caregiver for most of his life.

180.   The caseworkers that CFS has assigned to Teddy H. have failed to adequately monitor his placements or engage in effective case planning. They have not held any CFT meetings for Teddy H., have never shown or discussed his case plan with any of his foster parents, and the current caseworker has not properly supervised Teddy H.'s visits with his parents. As a result of the failings of CFS and its caseworkers, on one occasion, Teddy H.'s father walked out of the CFS office with him.

181.   What is more, CFS has not properly managed either Teddy H.'s service needs or permanency needs. CFS has provided no services to address Teddy H.'s

---

[2] Under California law, "[p]arents generally have the right to make educational decisions for their children unless their child is in a legal guardianship, their child has been freed for adoption (parental rights have been terminated), or the juvenile court has limited their educational rights." *California Foster Care Education Law Fact Sheets*, California Foster Youth Education Task Force (February 2014) at 9, https://www.courts.ca.gov/documents/BTB_23_5O_11.pdf.

FIRST AMENDE COMPLAINT

1    delayed speech issues. And, CFS has failed to help Teddy H.'s father with his
2    reunification plan.

3    182.    In short, Teddy H. needs a stable, permanent home along with services
4    to treat his delayed speech. But, CFS is not working with him, his relatives, or his
5    caregivers to ensure that he receives the care that he needs.

6        **D.    Kevin E. and Sam E.**

7    183.    Kevin E. and Sam E. are twins born on January 20, 2010. They have
8    been in CFS's custody since 2017 due to their biological parents' drug use. Their
9    father is incarcerated. CFS has shuffled Kevin E. and Sam E. through several foster
10   homes since they entered foster care. They have been in their current foster home
11   since November 2022.

12   184.    Kevin E. and Sam E.'s current foster parents have severely restricted
13   the boys' ability to communicate with friends and family. At the urging of CFS, they
14   have not allowed the boys to have cell phones or use social media, and they took
15   away Kevin E.'s tablet. They have instructed Kevin E. to avoid contacting Ms.
16   Fromm, their next friend and someone with ongoing concerns about the boys' safety
17   and wellbeing.

18   185.    CFS has also limited Kevin E. and Sam E.'s ability to visit friends and
19   family outside their foster parents' presence. At one CFT meeting, their caseworker
20   told Ms. Fromm that Ms. Fromm's daughter could only visit Kevin E. and Sam. E.
21   in the presence of their foster parents. The boys' grandparents are also only allowed
22   to have supervised visits.

23   186.    Kevin E. and Sam E. have had at least two caseworkers in the past six
24   months, both of whom appeared to be newly hired and unable to adequately
25   supervise or manage the boys.

26   187.    Ms. Fromm has observed that the boys may require mental health
27   services. For instance, Sam E. engages in attention-seeking and defiant behaviors,

28

while Kevin E. behaves in a withdrawn manner and has made depressive statements such as "KMS" ("kill myself").

188.   And after six years in foster care, CFS has never shown Kevin E. or Sam E. their case plan or done anything to recognize the teenage boys' own needs and preferences, as California law requires. Meanwhile, CFT meetings, when they have occurred, have failed to include all necessary parties.

189.   One virtual CFT meeting proceeded without a representative from the boy's FFA, the boys' grandparents (who were not even invited), or the boys themselves. And, during that meeting, the caseworker never brought up the boys' case plan or permanency plans.

190.   In another instance, the caseworker questioned whether Ms. Fromm should be allowed to attend CFT meetings even after Kevin E. specifically requested that she be included.

191.   Kevin E. and Sam E. have expressed to Ms. Fromm that, after six years in foster care, they are losing hope and feel like no one cares about them. These boys are legally entitled to a clear permanency plan developed with their preferences in mind, a concurrent plan, and any necessary treatment to address their psychological issues.

**E.    Henry P.**

192.   Henry P. was born on July 13, 2007, and has been in CFS's custody since December 2019. He lives in an FFA-licensed foster home in Huntington Beach, California. His biological father is incarcerated, and he has little contact with his biological mother.

193.   When Henry P. and his siblings first entered foster care, CFS had them spend several days at a CFS office sleeping on cots. CFS then separated the siblings, sending Henry P., his biological brother, and his step-brother to one foster family home and his sisters to another. The placement quickly ended because CFS placed

FIRST AMENDE COMPLAINT

Henry P. with foster parents who spoke only Spanish and with whom Henry P. could not communicate.

194.    Soon after, around February 2020, CFS moved Henry P., along with his biological brother, sister, and step-brother, to a foster parent who was his stepmother's friend. Henry P. struggled in this placement. He and his siblings were underfed and forced to spend most of the day outside, while the foster parent's children had ample food and freedom to move about the house.

195.    CFS eventually moved Henry P. to a group home in July 2021 after his previous foster parent claimed he was bullying his younger siblings. Those siblings remain in the last placement.

196.    Henry P. had a "terrible" experience at the group home. The environment was unstable, and there was not adequate food for residents. Henry P. often ate only peanut butter and jelly sandwiches for days on end. CFS's caseworkers visited him only four or five times during the 14 months he spent in that group home.

197.    CFS transferred Henry P. to a foster home in Huntington Beach, California in September 2022 after that foster family took an interest in him through a mutual acquaintance. This family has done its best to care for Henry P. but has been consistently hampered by CFS.

198.    CFS did not inspect the foster home before placing Henry P. there and did not timely transfer his files, leaving his foster parents unable to request medical assessments for weeks.

199.    What is more, Henry P. shows signs of potentially undiagnosed behavioral issues, but CFS has not identified any service needs or provided information on prior assessments. His foster parents have requested behavioral assessments, but CFS has made no referrals.

200.    Nor has CFS provided Henry P.'s foster parents with any clear permanency goal, even though there is an open inter-state compact request to send

FIRST AMENDE COMPLAINT

him to live with an aunt in New York that has been pending for two years. Henry P.'s foster parents have repeatedly requested updates and details, but CFS has provided none.

201.   CFS's caseworkers also do not visit Henry P. regularly. Henry P.'s previous caseworker contacted him only twice in seven months, and one of these meetings occurred on a video call. And the caseworker has not conducted any CFT meetings in his current foster home.

202.   Nor has CFS facilitated any visits with Henry P.'s father or siblings, despite Henry P.'s repeated requests. In September 2022, his foster parents began requesting visits for Henry P. with his father, whom he has not seen since November 2021. CFS only recently approved the visitation request in March 2023 but has not yet scheduled a visit. Henry P. has also not seen either of his brothers since July 2021.

203.   As of May 2023, Henry P. has no assigned caseworker. His previous caseworker appears to have been terminated for taking inappropriate photographs of children in his care.

204.   As a result of CFS's failures, Henry P.'s life is defined by uncertainty. Even though he is doing well in his current placement and receiving decent grades at his high school, he feels tremendous anxiety not knowing where he will be living or attending school next year. And, he does not have a meaningful connection with any of his prior caseworkers or anyone else at CFS to help guide him.

205.   Henry P., at 15 years old, is at a critical juncture in his life where he needs structure and stability. His lack of caseworker visits and family visits, along with inadequate permanency and concurrent planning, expose him to a substantial risk of harm.

FIRST AMENDE COMPLAINT

### F.    David O., Greg R., and Arnold O.

206.    David O. (born on August 15, 2009), Greg R. (born September 27, 2018), and Arnold O. (born March 6, 2021) are siblings who have been in CFS's custody since March 2021. The children still have a relationship with their mother, who struggles with mental health-related issues, and each has varying degrees of contact with their fathers.

207.    CFS placed the boys in four foster homes during their first two months in care. CFS later separated David O. from his brothers, eventually shuffling him through five more placements. As a result, David O. has had nine placements in just two years. Greg R. and Arnold O. each remain at their fourth placement.

208.    Though the children have a Latinx heritage, they speak only English. Despite this, CFS has repeatedly placed them in Spanish-only speaking foster homes. In their first two placements, the foster parents spoke no English at all; in their third placement, only one family member spoke English. In Greg R. and Arnold O.'s current placement, only the older children speak English.

209.    CFS has also failed to provide David O., Greg R., and Arnold O. with adequate planning and services and has assigned them five caseworkers in the past two years. These caseworkers have held only two CFT meetings in that time. Since separating David O. from his siblings, CFS has allowed only three visits among the brothers. Because of CFS's failures in this regard, at one point, David O. went 14 months without seeing his brothers.

### i.    David O.

210.    CFS moved David O. to his fifth placement after he complained that his prior foster parents' adult child slapped him. Once again, CFS moved him to a foster home where the foster parents spoke only Spanish. These foster parents expected David O. to handle all his laundry, cleaning, and cooking. As a result,

FIRST AMENDE COMPLAINT

David O. went weeks without clean clothes and suffered recurrent bowel problems from his poor diet.

211.   Soon after, CFS placed David O. in yet another foster home. There, without proper vetting or monitoring by CFS's caseworkers, the foster parents would verbally berate him. David O. reported the abuse to his grandmother, who relayed it to his caseworker. David O.'s caseworker never responded to this report of oral abuse, and soon after, the foster parent barred the grandmother from visiting David O.

212.   In February 2023, CFS abruptly removed David O. from that placement and transferred him to a youth shelter that lacked adequate supervision. On David O.'s first night, he left with a 17-year-old boy who had stolen a car. After he was caught, police returned him to the shelter. On another occasion, a young woman brought a knife into the facility, assaulted David O., and stabbed another resident.

213.   While David O. was at the shelter, his caseworker never provided him with necessary clothing, ensured he was enrolled in school, or arranged family visits. David O. could not even get a haircut because he lacked funds in his account.

214.   In February 2023, CFS moved David O. to his ninth and current placement at a group home in Oakland, California. The group home is several hundred miles from his younger brothers and nearly 1,000 miles from his grandmother's home in Colorado.

215.   David O. has many service needs. He was recently diagnosed with ADHD and PTSD and has a history of gastrointestinal issues. He also has untreated dental problems, requires updated corrective lenses, and requires additional psychological and medical services.

### ii.    Greg R. and Arnold O.

216.   CFS has not provided Greg R. and Arnold O.'s foster parents with any information about either of the boys' medical needs. Greg R. is behind on his

ongoing mental and physical health assessments, is overdue for dental follow-ups, and has untreated cavities. Moreover, he has food allergies and requires a special diet, which the current foster family does not provide. As a result, he has had trouble gaining weight.

217.   Greg R. is not yet toilet-trained at four years old, and, lacking adequate supervision or guidance from CFS, his foster family has made no efforts to address this issue. As a result, he is not yet eligible for preschool, and his social skills are falling behind.

218.   Arnold O. is non-verbal, has delayed motor skills, and requires specialized care, including occupational therapy, physical therapy, and speech therapy. CFS has failed to provide him with timely mental health, physical health, and dental assessments and services. Arnold O. also exhibits behavioral issues, such as pulling his brother's hair, biting, scratching, and throwing tantrums.

219.   Greg R. and Arnold O. need medical, behavioral, dental, and educational services that CFS is not providing. They also require placement in a home equipped to communicate with them properly.

220.   David O., Greg R., and Arnold O. all need and are legally entitled to a permanent plan that will provide them with a permanent family and an appropriate, individualized concurrent plan and the services necessary to ensure such a placement will likely succeed.

* * *

221.   Defendants' policies, patterns, practices, or customs have violated and will continue to violate these children's rights under state and federal laws. Inadequate staffing, for instance, prevents CFS caseworkers from adequately supervising the children and supporting their families or foster parents. And Defendants are keeping these children in unsuitable homes without providing adequate case planning to ensure each child has both a clear permanent plan and

alternate concurrent plan, as well as the necessary services that state and federal laws require. These children thus have all been harmed and all remain at risk of continued suffering and irreparable harm.

/ / /

## CLASS ACTION ALLEGATIONS

222.   This action is proper as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

223.   This action consists of one general class and one subclass:

   a)   all children for whom CFS has or will have legal responsibility and who are or will be in CFS's legal and physical custody ("General Class");

   b)   all children who are or will be in CFS's custody and have physical, cognitive, and/or psychological disabilities ("ADA Subclass").

224.   Each class is numerous enough to make joinder impracticable:

   a)   The General Class consists of around 5,771 children who currently are in or will enter CFS's custody;

   b)   The ADA Subclass consists of hundreds of children with disabilities who are already in or will enter CFS's custody.

225.   The questions of fact and law that the Plaintiffs raise are common to and typical of those of each putative member of the General Class and ADA Subclass whom they seek to represent.

226.   The named Plaintiffs rely on the State Defendants and County Defendants for foster care services in San Bernardino County and wholly depend on them to provide those services.

227.   Defendants' long-standing and well-documented actions and inactions substantially depart from accepted professional judgment and standards and constitute deliberate indifference to the harm and risk of harm to and violations of

FIRST AMENDE COMPLAINT

the Plaintiffs and their legal rights and those of the General Class and ADA Subclass they represent.

228. Common questions of fact to the General Class and ADA Subclass include:

a) whether the State Defendants and County Defendants fail to protect the General Class from physical and psychological harm and risk of harm;

b) whether the State Defendants and County Defendants provide adequate caseworker resources to ensure that members of the General Class and ADA Subclass routinely meet with caseworkers face-to-face, receive individualized case plans, and receive all necessary services to enable the General Class and ADA Subclass to avoid harm and the risk of harm;

c) whether the County Defendants take steps required to initiate termination of parental rights proceedings for all children who have been in foster care for 15 out of the last 22 months unless there is a compelling reason why that would not be in the child's best interests as documented in the record, or the child is otherwise eligible for a statutory exception; and

d) whether the State Defendants and County Defendants operate a system that adequately tailors appropriate placements, treatments, and supports to the individual needs of the members of the General Class and ADA Subclass;

e) whether the State Defendants and County Defendants operate a system that provides an adequate number and diversity of placements to permit the members of the General Class and ADA Subclass to reside in the least restrictive and most family-like environment;

FIRST AMENDE COMPLAINT

f)    whether the State Defendants and County Defendants operate a system that promptly and adequately assesses the individual needs of members of the General Class and ADA Subclass;

g)    whether the State Defendants and County Defendants deprive members of the ADA Subclass of necessary and appropriate services to ensure access to home and community-based placements and supports so that they can fully benefit from foster care services.

229.  Common questions of law to the General Class and ADA Subclass include:

a)    whether the State Defendants and County Defendants' systemic failures violate Plaintiffs' rights under the Adoption Assistance and Child Welfare Act, as amended by the Adoption and Safe Families Act, including their right to placement in the least restrictive, most family-like setting, closest to their home community that conforms to professional standards, placement with relatives whenever possible, access to necessary services to protect their safety and health, and comprehensive written case plans, along with a case review system ensuring those case plans are in place and are updated, and their right to permanency by seeking the termination of parental rights after they have been in custody for 15 out of the last 22 months, subject to certain exceptions;

b)    whether the County Defendants' systemic failures violate Plaintiffs' rights under the California Welfare and Institutions Code, including their right to comprehensive written case plans, along with a case review system ensuring those case plans are in place and are updated; and

c)    whether the State Defendants and County Defendants' systemic failures violate Plaintiffs' substantive rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including

FIRST AMENDE COMPLAINT

exposing children to neglect, abuse, trauma, harmful and inadequate placements, lack of necessary services, and lack of permanency planning;

d)    whether the County Defendants' systemic failures violate Plaintiffs' substantive rights under Article I of the California Constitution, including exposing children to neglect, abuse, trauma, harmful and inadequate placements, lack of necessary services, and lack of permanency planning;

e)    whether the State Defendants and County Defendants' systemic failures violate Plaintiffs' rights under the First Amendment's right of association and right to a permanent family, along with the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's right to due process;

f)    whether the State Defendants and County Defendants' systemic failures violate the ADA Subclass Plaintiffs' rights under (1) the Americans with Disabilities Act; (2) the Rehabilitation Act; and (3) all regulations issued to implement the above laws;

g)    whether the County Defendants' systemic failures violate the ADA Subclass Plaintiffs' rights under the California Government Code.

230.    The violations of law and resulting harms that Plaintiffs allege are typical of the legal violations and harms or risk of harm that all children in the General Class and ADA Subclass experience.

231.    The named Plaintiffs will fairly protect the interests of the General Class and ADA Subclass they seek to represent.

232.    Defendants have acted or failed to act on grounds generally applicable to all members of the General Class or, where appropriate, ADA Subclass, requiring class-wide declaratory and injunctive relief.

233.    Counsel for Plaintiffs know of no conflict among the class members.

FIRST AMENDE COMPLAINT

234.   These attorneys, who are competent and experienced in class action litigation, child welfare litigation, and complex civil litigation, represent the named Plaintiffs:

a)   Attorneys from A Better Childhood, Inc., a nonprofit legal advocacy organization, including the Executive Director, Marcia Robinson Lowry, and staff attorney Jonathan Borle. Both have extensive experience and expertise in federal child welfare class actions throughout the United States.

b)   Attorneys from Sheppard, Mullin, Richter & Hampton LLP, a full-service law firm, including Partners Polly Towill and Daniel Brown, both of whom have extensive experience and expertise in complex litigation and class actions in state and federal courts.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**42 U.S.C. § 1983–The Adoption Assistance and Child Welfare Act (On Behalf of the General Class Against State Defendants and County Defendants)**

235.   Plaintiffs repeat and incorporate each allegation in this First Amended Complaint.

236.   Federal law gives Plaintiffs specific rights under the AACWA.

237.   Defendants' foregoing policies, patterns, practices, or customs deprive Plaintiffs of their rights under the AACWA, as amended by the ASFA, to:

a)   placement in the least restrictive and most family-like setting, closest to their home community that conforms to nationally recommended professional standards, 42 U.S.C. §§ 671(a)(16), 675(5)(A);

b)   access to quality services to protect their safety and health, 42 U.S.C. § 671(a)(22);

c)   a written case plan that includes a plan to provide safe, appropriate, and stable placements, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

FIRST AMENDE COMPLAINT

d)    a written case plan that ensures that they receive safe and proper care while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

e)    a written case plan that ensures the provision of services to themselves, their parents, and their foster parents to facilitate reunification, or where that is not practicable, their permanent placement and implementation of that case plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

f)    a case review system in which each Plaintiff has a case plan designed to achieve safe and appropriate foster care placements in the least restrictive and most family-like setting, close to their home community, 42 U.S.C. §§ 671(a)(16), 675(5)(A); and

g)    the right to have a petition to terminate parental rights filed if the Plaintiff has been in foster care for 15 out of the last 22 months unless doing so would be against their best interest as documented in the case record or a statutory exemption applies. 42 U.S.C. § 675(5)(E).

238.    These provisions are intended to benefit Plaintiffs and members of the General Class and ADA Subclass. The rights conferred by these provisions are neither vague nor amorphous, such as to strain judicial competence, and the statute imposes a binding obligation on the states. 42 U.S.C. § 1983; *see also Henry A. v. Willden*, 678 F.3d 991, 1008–09 (9th Cir. 2012).

### SECOND CAUSE OF ACTION
**Cal. Welf. & Inst. Code § 16501.1, 16503(a), *et seq.*–State Statutory Rights (On Behalf of the General Class Against County Defendants)**

239.    Plaintiffs repeat and incorporate each allegation in this First Amended Complaint.

240.    The California Government Code imposes liability on public entities for injuries proximately caused by their failure to discharge a mandatory duty

"unless the public entity establishes that it exercised reasonable diligence to discharge the duty." Cal. Gov't Code § 815.6.

241.   State law imposes specific mandatory duties on the County Defendants under the California Welfare and Institutions Code.

242.   The County Defendants' foregoing policies, patterns, practices, or customs deprive Plaintiffs of their rights in the California Welfare and Institutions Code, including:

a)      the right to have "[a] written case plan . . . completed within a maximum of 60 days of the initial removal of the child," Cal. Welf. & Inst. Code § 16501.1(e);

b)      the right to have the case plan updated "no less frequently than once every six months," and for "[e]ach updated case plan [to] include a description of the services that have been provided to the child under the plan and an evaluation of the appropriateness and effectiveness of those services," *id.*;

c)      the right to have the case plan "identify specific goals and the appropriateness of the planned services in meeting those goals," Cal. Welf. & Inst. Code § 16501.1(g)(2);

d)      the right to have the case plan "include provisions for the development and maintenance of sibling relationships," Cal. Welf. & Inst. Code § 16501.1(g)(6);

e)      the right to have the case plan "ensure the educational stability of the child while in foster care," Cal. Welf. & Inst. Code § 16501.1(g)(8);

f)      if the child's permanency goal is reunification, the right to have the case plan "describe the services to be provided to assist in reunification," Cal. Welf. & Inst. Code § 16501.1(g)(10);

g)    if the child's permanency goal is not reunification, the right to have the case plan "include a statement of the child's wishes regarding their permanent placement plan and an assessment of those stated wishes" Cal. Welf. & Inst. Code § 16501.1(g)(15);

h)    the right to have "the agency responsible for placement and care of a minor . . . ensure that a child in foster care . . . receive[s] administrative reviews periodically but no less frequently than once every six months," Cal. Welf. & Inst. Code § 16503(a); and

i)    the right to have the administrative review "determine the appropriateness of the placement, the continuing appropriateness and extent of compliance with the permanent plan for the child, the extent of compliance with the case plan, and adequacy of services provided to the child." Cal. Welf. & Inst. Code § 16503(a).

243.    These provisions are intended to benefit Plaintiffs and the classes they represent. The rights they confer are neither vague nor amorphous, such as to strain judicial competence, and the statute imposes a binding obligation on the states.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983–Federal Right to Substantive Due Process (On Behalf of the General Class Against State Defendants and County Defendants)

244.    Plaintiffs repeat and incorporate each allegation in this First Amended Complaint.

245.    States and municipal entities assume affirmative duties under the Fourteenth Amendment to the United States Constitution to provide reasonable care and protect from harm any child with whom they have formed a special relationship, such as children in foster care.

246.    These substantive due process rights include, but are not limited to:

a)    the right to freedom from the foreseeable risk of maltreatment while under the protective supervision of the State;

FIRST AMENDE COMPLAINT

b)    the right to protection from unnecessary intrusions into the child's emotional wellbeing once the State has established a special relationship with that child;

c)    the right to services necessary to prevent unreasonable risk of harm in the least restrictive environment;

d)    the right to conditions and duration of foster care reasonably related to the purpose and assumption of government custody;

e)    the right to treatment and care consistent with the purpose and assumptions of government custody;

f)    the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody; and

g)    the right to receive or be reunited with an appropriate permanent home and family within a reasonable period.

247.    Defendants have developed and maintained policies, patterns, practices, or customs that represent a substantial departure from accepted professional judgment and standards and deprive all members of the General Class their constitutionally-protected rights.

248.    Defendants know that these policies, patterns, practices, or customs exist and harm these class members, yet are deliberately indifferent to the harm they cause. As a result, all the members of the General Class have been, and are at substantial risk of being, deprived of their constitutional rights.

## FOURTH CAUSE OF ACTION
### Art. I, §7(a) Cal. Const.–State Right to Substantive Due Process (On Behalf of the General Class Against County Defendants)

249.    Plaintiffs repeat and incorporate each allegation in this First Amended Complaint.

250. Municipal entities assume affirmative duties under Article I of the California Constitution to provide care and protect from reasonable harm any child with whom it has formed a special relationship, such as those in foster care.

251. County Defendants have developed and maintained policies, patterns, practices, or customs that substantially depart from accepted professional judgment and deprive all members of the General Class of their constitutionally-protected rights.

252. Defendants know that these policies, patterns, practices, or customs exist and harm these class members, yet are deliberately indifferent to them. As a result, all the members of the General Class have been, and are at substantial risk of being, deprived of their constitutional rights.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983–Federal Right to Family Association (On Behalf of the General Class Against State Defendants and County Defendants)**

253. Plaintiffs repeat and incorporate each allegation in this First Amended Complaint.

254. The First Amendment's right of association and right to a permanent family, along with the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's right to due process, impose on states and municipalities affirmative duties to provide reasonable efforts to obtain a permanent home and family.

255. The General Class members are in Defendants' custody or guardianship and depend on Defendants to provide for their basic physical, psychological, and emotional needs and to protect them from physical, psychological, and emotional harm.

256. These class members frequently and foreseeably suffer physical, psychological, and emotional harm in CFS's custody. This harm occurs partly

FIRST AMENDE COMPLAINT

because these class members are continually shuttled between temporary and often non-familial custodial arrangements.

257.    Therefore, professional judgment and standards of conduct require the Defendants to make reasonable efforts toward placing children in their custody in stable, permanent families.

258.    Defendants know the General Class members have a right to a permanent home and family yet have failed to make reasonable efforts to achieve this.

259.    Defendants' foregoing policies, patterns, practices, or customs represent a substantial departure from professional judgment and deliberate indifference to the General Class members' constitutional rights.

260.    As a result, the General Class members of the General Class have been, and are at risk of being, deprived of their right to familial association and reasonable protection from physical, psychological, and emotional harm while in Defendants' custody. This violates the First Amendment's freedom of association, the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's substantive due process protections.

## SIXTH CAUSE OF ACTION
### 42 U.S.C. § 12131 *et seq.* –The Americans with Disabilities Act
### (On Behalf of the ADA Subclass Against State Defendants and County Defendants)

261.    Plaintiffs repeat and incorporate each allegation in this First Amended Complaint.

262.    Title II of the ADA, 42 U.S.C. § 12131, *et seq.*, and its enabling regulations, 28 C.F.R. 35.101 *et seq.* (2022), prohibit public entities from discriminating against individuals with disabilities because of their disability.

263.    Specifically, "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

FIRST AMENDE COMPLAINT

services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

264. Members of the ADA Subclass experience physical, cognitive, and psychological disabilities that qualify them as individuals with disabilities under the ADA. 42 U.S.C. § 12131(2).

265. Defendants are public entities and public officials of those entities, and all are subject to the ADA. 42 U.S.C. § 12131(1)(A)–(B).

266. Under the regulations implementing the ADA, public entities may not, directly or through contractual, licensing, or other arrangements, do any of the following based on an individual's disability:

a)    "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from aid, benefit, or service," 28 C.F.R. § 35.130(b)(1)(i);

b)    "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii);

c)    "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii);

d)    "[a]id or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program," 28 C.F.R. § 35.130(b)(1)(v); or

FIRST AMENDE COMPLAINT

e)    "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service," 28 C.F.R. § 35.130(1)(vii).

267.    A public entity also may not use criteria or methods of administration that:

a)    "have the effect of subjecting qualified individuals with disabilities to discrimination based on disability," 28 C.F.R. § 35.130(b)(3)(i);

b)    "have the purpose or effect of defeating or substantially impairing the accomplishments of the objectives of the public entity's program with respect to individuals with disabilities," 28 C.F.R. § 35.130(b)(3)(ii); or

c)    "perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State," 28 C.F.R. § 35.130(b)(3)(iii).

268.    Instead, the public entity is required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability[.]" 28 C.F.R. § 35.130(b)(7)(i).

269.    Defendants, however, through their foregoing policies, patterns, practices, or customs, have discriminated against the members of the ADA Subclass based on their disabilities in violation of 42 U.S.C. § 12132.

270.    As a result, the ADA Subclass members have suffered injuries, are at risk of suffering injuries, and will continue to be at risk of suffering further injuries unless Defendants are required to comply with applicable law.

## SEVENTH CAUSE OF ACTION
### 29 U.S.C. § 701 *et seq.*–The Rehabilitation Act
### (On Behalf of the ADA Subclass Against State Defendants and County Defendants)

271.    Plaintiffs repeat and incorporate each allegation in this First Amended Complaint.

272.   Like the ADA, the Rehabilitation Act and its implementing regulations prohibit entities receiving federal funding from excluding individuals with disabilities or from discriminating against individuals because of their disabilities. 29 U.S.C. § 794(a).

273.   Under the regulations implementing the Rehabilitation Act, covered entities may not, directly or through contractual, licensing, or other arrangements, do any of the following based on disability:

a)   "[d]eny a qualified [individual with a disability] the opportunity to participate in or benefit from aid, benefit, or service," 45 C.F.R. § 84.4(b)(1)(i); *see also* 45 C.F.R. §84.52(a)(1);

b)   "[a]fford a qualified [individual with a disability] an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," 28 C.F.R. § 84.4(b)(1)(ii); *see also* 45 C.F.R. §84.52(a)(2);

c)   "[p]rovide a qualified [individual with a disability] with an aid, benefit, or service that is not as effective as that provided to others," 28 C.F.R. § 84.4(b)(1)(iii), (2); *see also* 45 C.F.R. §84.52(a)(3);

d)   "[p]rovide benefits or services in a manner that limits or has the effect of limiting the participation of qualified [individuals with disabilities]," 45 C.F.R. §84.52(a)(4);

e)   "[a]id or perpetuate discrimination against a qualified [individual with a disability] by providing significant assistance to an agency, organization, or person that discriminates on the basis of [disability] in providing any aid, benefit, or service to beneficiaries of the [covered entity's] program," 28 C.F.R. § 84.4(b)(1)(v); or

f) "[o]therwise limit a qualified [individual with a disability] in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service." 28 C.F.R. § 84.4(b)(1)(vii).

274.  A public entity also may not use criteria or methods of administration that:

a) "have the effect of subjecting qualified [individuals with disabilities] to discrimination on the basis of [disability]," 28 C.F.R. § 84.4(b)(4)(i);

b) "have the purpose or effect of defeating or substantially impairing accomplishments of the objectives of the [covered entity's] program or activity with respect to [individuals with disabilities]," 28 C.F.R. § 84.4(b)(ii); or

c) "perpetuate the discrimination of another [covered entity] if both public entities are subject to common administrative control or are agencies of the same State," 28 C.F.R. § 84.4(b)(iii).

275. Members of the ADA Subclass have physical, cognitive, and psychological disabilities that make them qualified individuals with disabilities under the Rehabilitation Act. 29 U.S.C. § 705(20).

276. The Defendants receive substantial federal funding to operate the statewide foster care system, and CDSS and CFS's operations constitute a "program or activity" under the Rehabilitation Act. 29 U.S.C. § 794(a), (b)(1)(A).

277. For all the reasons set forth above, Defendants have violated the Rehabilitation Act by failing to provide foster children with disabilities an equal opportunity to participate in foster care services detailed above.

278. As a result of Defendants' past and ongoing violations of the Rehabilitation Act, the ADA Subclass members have suffered injuries, are at risk of

FIRST AMENDE COMPLAINT

suffering injury, and will continue to be at risk of suffering further injuries unless Defendants are required to comply with applicable law.

## EIGHTH CAUSE OF ACTION

**Cal. Gov't Code § 11135 *et seq.*, Cal. Code Regs. tit. 2 § 11140 *et seq.*–State Right Against Unlawful State Discrimination (On Behalf of the ADA Subclass Against County Defendants)**

279.    Plaintiffs repeat and incorporate each allegation in this First Amended Complaint.

280.    The County Defendants have discriminated against Plaintiffs and members of the ADA Subclass by failing to make reasonable modifications in their policies, patterns, practices, or customs that would allow them to participate in and benefit from the County Defendants' foster care and health services.

281.    Reasonable modification of County Defendants' policies, patterns, practices, or customs would not fundamentally alter the nature of their services, programs, or activities but would further their stated goals.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs request that this Honorable Court:

I.    Assert jurisdiction over this action.

II.    Order that Plaintiffs may maintain this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

III.    Under Rule 57 of the Federal Rules of Civil Procedure, declare unconstitutional and unlawful:

 a.    Defendants' violation of Plaintiffs' rights under the AACWA, as amended by the ASFA;

 b.    County Defendants' violation of Plaintiffs' rights under the California Welfare and Institutions Code;

 c.    Defendants' violation of Plaintiffs' rights under the Fourteenth Amendment to the U.S. Constitution;

FIRST AMENDE COMPLAINT

d.      County Defendants' violation of Plaintiffs' rights under Article I of the California Constitution;

e.      Defendants' violation of Plaintiffs' rights under the First, Ninth, and Fourteenth Amendments to the U.S. Constitution;

f.      Defendants' violation of ADA Subclass Plaintiffs' rights under the ADA;

g.      Defendants' violation of ADA Subclass Plaintiffs' rights under the Rehabilitation Act;

h.      County Defendants' violation of ADA Subclass Plaintiffs' rights under the California Government Code.

IV.    Permanently enjoin Defendants from subjecting Plaintiffs to practices that violate their rights, including:

a.      requiring the County Defendants to maintain caseloads for each caseworker providing direct supervision and planning for children following accepted professional standards, as developed by either the COA or the CWLA;

b.      requiring the County Defendants to recruit or retain enough qualified and trained workers to provide direct supervision and planning for foster children, as set by the COA or CWLA;

c.      requiring that the County Defendants ensure that all children who enter foster care placement receive, within 60 days of entering care, an adequate and individualized written case plan for treatment, services, and supports to address the child's identified needs;

d.      requiring the County Defendants to describe, in each child's written case plan, steps for reunification with the child's parents, adoption, or another permanent, family-like setting;

FIRST AMENDE COMPLAINT

e.    requiring the County Defendants to describe, in each child's written case plan, any interim placements appropriate for the child before obtaining a permanent home-like setting;

f.    requiring the County Defendants to describe, in each child's written case plan, the steps needed to keep the child safe during the child's time in Defendants' custody;

g.    requiring the County Defendants to ensure that all children whose case plan identifies a need for services or treatments timely receive those services or treatments;

h.    requiring the County Defendants to operate adequate short-term emergency placements so that foster children no longer sleep in CFS's offices;

i.    requiring the County Defendants to develop a process to properly match children with appropriate foster home placements, including FFA homes, and prioritize FFA homes for children with elevated needs;

j.    requiring the County Defendants to place children in placements that are safe, appropriate, and in the least restrictive environment that best suit their individual needs;

k.    requiring the County Defendants to properly screen and vet all foster family homes before placing any foster children in those homes;

l.    requiring the County Defendants to ensure CFS caseworkers conduct in-home visits at least once per month, during which caseworkers will thoroughly inspect the home and interview the foster children separately from the foster parents;

m.    requiring the County Defendants to file and proceed with a timely petition to free a child for adoption when the child's permanency plan is adoption unless the child's case plan documents that doing so is not

in the child's best interest or that the child has a statutory exemption from this requirement;

n. requiring the County Defendants to take all necessary steps to seek and secure an appropriate adoptive placement for a child when the child's plan is adoption;

o. requiring the County Defendants to provide all necessary services to each child who enters foster care, including essential services to the child's parents to ensure a speedy reunification for as long as the child's permanency plan remains reunification;

p. requiring the County Defendants, with the assistance of the State Defendants, to ensure that an adequate array of community-based therapeutic services are available to children with disabilities;

q. requiring the County Defendants, with the assistance of the State Defendants, to develop an adequate array of community-based therapeutic foster homes and therapeutic placements to meet the needs of children with disabilities;

r. requiring the County Defendants, with the assistance of State Defendants, to ensure that all children who enter foster care placement receive, within 30 days of entering care, a comprehensive evaluation of the child's needs performed by a qualified individual, including an evaluation of whether the child has any physical or mental disabilities sufficient to be categorized as a child with disabilities under the ADA and that the child be reevaluated as the child's needs and the information available to Defendants change;

s. requiring the State Defendants and County Defendants to conduct annual case record reviews of a statistically significant sample of children in CFS's custody to measure how likely children in CFS's

FIRST AMENDE COMPLAINT

custody are to receive timely permanence under federal law, how often they are maltreated in care, and how placement stability is maintained for these children;

t.  requiring the State Defendants to develop and implement a plan to ensure that CFS takes all reasonable steps to bring its practices into conformity with federal standards, using all tools at the State Defendants' disposal; and

u.  requiring State Defendants to develop and implement a plan to require CFS to ensure permanent placements for children in San Bernardino County, as federal law requires, to bring the County's maltreatment rate into compliance with federal standards, and to ensure placement stability for children in San Bernardino County.

V.  Award Plaintiffs the reasonable costs and expenses incurred to litigate this action, including reasonable attorneys' fees under 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and the Federal Rules of Civil Procedure 23(e) and (h).

VI.  Grant such other equitable relief as the Court deems just, necessary, and proper to protect Plaintiffs from further harm while in CFS's custody.

FIRST AMENDE COMPLAINT

Dated:  August 14, 2023

A BETTER CHILDHOOD


By      /s/ Marcia Robinson Lowry
        Marcia Robinson Lowry (*admitted pro hac vice*)
        mlowry@abetterchildhood.org
        Jonathan G. Borle (SBN # 314669)
        jborle@abetterchildhood.org
        355 Lexington Avenue, Floor 16
        New York, NY 10017
        Telephone: (646) 795-4456
        Facsimile: (212) 692-0415

        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
        Polly Towill (SBN # 120420)
        ptowill@sheppardmullin.com
        Daniel Brown (*admitted pro hac vice*)
        dlbrown@sheppardmullin.com
        Benjamin O. Aigboboh (SBN # 268531)
        baigboboh@sheppardmullin.com
        Tori Kutzner (SBN # 334057)
        tkutzner@sheppardmullin.com
        Victoria Ayeni (SBN # 334233)
        vayeni@sheppardmullin.com
        Alexandria Amerine (*admitted pro hac vice*)
        aamerine@sheppardmullin.com
        333 S. Hope St., Forty-Third Floor
        Los Angeles, CA 90071
        Telephone: (213) 620-1780
        Facsimile: (213) 620-1398


        *Attorneys for Plaintiffs*

-69-

FIRST AMENDE COMPLAINT